IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| DIGITAL BROADCASTING SOLUTIONS, LLC,<br><br>                        Plaintiff,<br><br>        v.<br><br>DISH NETWORK, L.L.C and DISH TECHNOLOGIES, L.L.C,<br><br>                        Defendants. | CIVIL ACTION NO. 2:22-cv-00335<br><br>ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Digital Broadcasting Solutions, LLC ("DBS") files this original complaint against DISH Network, L.L.C. and Dish Technologies, L.L.C. ("DISH"), alleging based on its own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows:

**PARTIES**

1.      Digital Broadcasting Solutions, LLC is a Texas limited liability company, with its principal place of business at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

2.      Defendant DISH Network, L.L.C., is a corporation organized under the laws of the State of Colorado.  Its principal place of business is 9601 S. Meridian Blvd., Englewood, Colorado 80112.  DISH Network, L.L.C. provides services and digital video recorder ("DVR") technology in the United States, including within this judicial district.

3.      Defendant DISH Technologies L.L.C. is a limited liability company organized and existing under the laws of the State of Colorado, with its principal place of business at 9601 South

Meridian Boulevard, Englewood, Colorado 80112. DISH Technologies, L.L.C. provides services and digital video recorder ("DVR") technology in the United States, including within this judicial district.

## JURISDICTION AND VENUE

4.      DBS repeats and re-alleges the allegations in Paragraphs 1-3 as though fully set forth in their entirety.

5.      This is an action for infringement of United States patents arising under 35 U.S.C. §§ 271, 281, and 284–85, among others.  This Court has subject matter jurisdiction of the action under 28 U.S.C. § 1331 and § 1338(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1400(b) and 1391(c).

7.      DISH is subject to the Court's specific and general personal jurisdiction due at least to DISH's substantial business in this forum, including (i) at least a portion of the infringements alleged herein; or (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Texas and in this district.

8.      Specifically, DISH intends to do and does business in Texas, directly or through intermediaries, and offers its products or services, including those accused herein of infringement, to customers and potential customers located in Texas, including in the Eastern District of Texas.

9.      DISH maintains regular and established places of business in this district through its authorized retailers, including but not limited to locations in:

a.   801 Ave. K, Ste. 2, Plano, TX 75074;

b.   512 N Hwy. 377, Argyle, TX 76226;

c.   1010 Fort Worth Dr., Denton, TX 76205;

d.  901 S Hwy. 377, Aubrey, TX 76227;

e.  6202 Texoma Pkwy., Sherman, TX 75090;

f.  2270 NE Loop 286, Paris, TX 75460;

g.  1217 S Broadway St., Ste. A2, Sulphur Springs, TX 75482;

h.  189 N Texas St., Emory, TX 75440;

i.  518 Houston St., Ste. B, Wills Point, TX 75169;

j.  103 Lacosta St., Athens, TX 75751;

k.  107 Ferguson Rd., Palestine, TX 75803;

l.  416 S Robb St., Trinity, TX 75862;

m.  1909 S 1st St., Lufkin, TX 75901; and

n.  1215 E Marshall Ave., Ste. C, Longview, TX 75601.

*See* https://www.dish.com/find-retailer/.  DISH may be served with process through its registered agent for service in Texas:  Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, located at 211 East 7th Street, Suite 620, Austin, Texas 78701.

10.      On information and belief, DISH owns or leases, and maintains and operates several Local Receive Facilities (LRFs) in this district.

11.      On information and belief, in each of those LRFs, DISH owns and stores equipment such as receivers and servers.  Each of these LRFs are used to acquire and transmit local television channels over the DISH spectrum to DISH customers.

12.      On information and belief, DISH employs personnel that install, service, repair and/or replace equipment associated with the LRFs, as appropriate, in this district.

13.      DISH has not disputed the Court's personal jurisdiction over DISH in other recent patent-infringement actions.  *See, e.g.,* Answer at ¶ 17, *American Patents LLC v. Dish Network*

*Corporation et al.*, Civil Action No. 4:20-cv-00905-ALM; Dkt. 27, (E.D. Tex. 2021) (not contesting and admitting facts related to jurisdiction).

14.    Venue is proper against DISH in this district pursuant to 28 U.S.C. § 1400(b) because it has maintained established and regular places of business in this District and has committed acts of patent infringement in the district. *See In re Cray Inc.*, 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

15.    DISH has regular and established places of business in this district, including at least at 6826 Industrial Road, Beaumont, TX 77705:



https://www.google.com/maps/place/6826+Industrial+Rd,+Beaumont,+TX+77705/@29.987721
8,-
94.2059832,3a,60y,90t/data=!3m6!1e1!3m4!1sZoqooNoTRZyV1pq8r1aFqQ!2e0!7i13312!8i665
6!4m13!1m7!3m6!1s0x863ece6e207baed5:0xb1cf336229ef9ee7!2s6826+Industrial+Rd,+Beaum

4

ont,+TX+77705!3b1!8m2!3d29.9879766!4d-
94.2063085!3m4!1s0x863ece6e207baed5:0xb1cf336229ef9ee7!8m2!3d29.9879766!4d-
94.2063085 (last accessed Aug. 16, 2022).

16.     DISH has regular and established places of business in this district, including at least at 2100 Couch Drive, McKinney, Texas 75069:



https://www.google.com/maps/place/2100+Couch+Dr,+McKinney,+TX+75069/@33.1725101,-
96.6114073,78a,35y,350.62h/data=!3m1!1e3!4m13!1m7!3m6!1s0x864c1187ee13f5b9:0x94ca75
fab47b7ba0!2s2100+Couch+Dr,+McKinney,+TX+75069!3b1!8m2!3d33.1725101!4d-
96.6112958!3m4!1s0x864c1187ee13f5b9:0x94ca75fab47b7ba0!8m2!3d33.1725101!4d-
96.6112958 (last accessed Aug. 16, 2022).

17.     Upon information and belief, DISH targets its advertisements to residents of this district.

18.     In a recent patent case, DISH did not contest that venue was proper in this forum. *See, e.g.*, Answer at ¶ 19, *American Patents LLC v. Dish Network Corporation et al.*, Civil Action

No. 4:20-cv-00905-ALM; Dkt. 27 (E.D. Tex. 2021) ("DISH does not contest the propriety of venue at this time…").

## THE TECHNOLOGY

19.     DBS repeats and re-alleges the allegations in Paragraphs 1-18 as though fully set forth in their entirety.

20.     DBS was founded by Todd Fitzsimmons, the sole inventor of the two Asserted Patents.  In 1982, Mr. Fitzsimmons's father, George Fitzsimmons, founded Pacific Satellite Systems, a business that installed and programmed home satellite systems. Mr. Fitzsimmons worked for Pacific Satellite Systems through junior high and high school, providing him with valuable experience and sparking his interest in satellite television and its related equipment. Mr. Fitzsimmons received a B.S. in Electrical Engineering from the University of Washington in 1994. He continued his education by earning a J.D. from Loyola Law School (Los Angeles) in 2000. Being an inventor of his own patents, Mr. Fitzsimmons has for the past two decades counseled and represented clients in the acquisition, management, enforcement, and protection of intellectual property rights.

21.     The patents-in-suit, U.S. Patent Nos. 8,929,710 (the "'710 patent) and 9,538,122 (the "'122 patent") (collectively, the "Asserted Patents"), are generally directed to innovations in time shifting video programs that relate to a system and method allowing a digital video recorder ("DVR") to skip commercials, especially when the commercials are no longer relevant given the passage of time, without altering the content of the original program.

22.     In preferred embodiments, the Asserted Patents are directed to DVR technology, and more specifically to a DVR that is configured to skip a portion of a video program (e.g.,

commercials) only after a period of time has expired and only when the DVR has been placed in a second playback state (e.g., a commercial skipping state).

23.     The Asserted Patents have several advantages or benefits over conventional DVR technology.  A first benefit is to <u>the user</u>; by allowing the user to switch the DVR between first and second states, the user can choose to either watch the program in its entirety as broadcasted (e.g., including commercials) or watch only a portion of the program (e.g., skipping the commercials).

24.     A second benefit is to <u>the advertiser</u>; playing the program in its entirety during the first period of time, regardless of the playback state of the DVR, ensures playback of a commercial during the advertiser's contracted period of time and when the commercial is most relevant.  "For example, a program may include an advertisement for a movie that is currently being shown at a local theater.  If, however, the user does not watch the program for several weeks, the movie may no longer be playing at the local theater."  '710 Patent, col. 1, ll. 50-61.  In this example, the advertisement for the movie "is removed only after its value has diminished."  *Id*. at Abstract.

25.     A third benefit is to <u>the broadcaster</u>; by transmitting the program in its entirety and using the DVR to automatically skip over portions of the program, copyright issues can be avoided.  This is in contrast to DVRs (or receivers) that can download commercial-free programming, which generally requires the broadcaster to receive permission from the content owner to alter the programming or face potential copyright violations.  It also generally requires both the broadcaster and the user to pay for the commercial-free programming.  The technology claimed in the Asserted Patents does not require either, as the programming (or portions thereof) is not altered, but merely skipped.

26.      This is accomplished using non-conventional improvements to traditional, conventional DVR technology.  To accomplish the foregoing, the DVR must have information on when certain portions of the program (e.g., commercials) begin and when they end.  By way of example, as shown in Figure 6 (reproduced below), "time-shifted data 600 may be stored as a single program that includes three segments 610, 620 and 630 and two commercial breaks 640, 650."  *Id*. at col. 7, ll. 4-18.  The DVR should not only store the program—so that it may be time-shifted, or watched at a later time—but it should also receive and store information on the program. "This information may include, for example, when the commercial break begins, when the commercial break ends, the duration of the commercial break, etc."  *Id*.



Figure 6

27.      This "information," which may be included in the "auxiliary data" (e.g., commercial data), needs to be acquired and associated (e.g., linked) with the program data.  This may be accomplished, for example, using a processor (P) and a memory (M), where the processor (P) is configured to execute non-conventional code (or perform a series of non-conventional steps). Such a DVR can be seen in Figure 7, which is reproduced below.



**Figure 7**

28.     By way of example, if the user wishes to watch a program after the commercials are no longer relevant (e.g., a week after the program originally aired), in addition to the stored program data, "the processor 740 would also acquire auxiliary data.  The auxiliary data could be acquired from either the memory 760 (if previously received) or from the content owner or content provider (e.g., via antenna 780 or the like (e.g., satellite, cable, etc.))."  *Id.* at col. 8, ll. 13-29.

29.     "In one embodiment of the present invention, the processor 740 uses information included in the time-shifted data and/or linked to the time-shifted data (e.g., in memory) to acquire the auxiliary data."  *Id.* at col. 8, ll. 30-47.  Such information could be acquired via a particular channel, which "could either be identified in the time-shifted data or in a look-up table."  *Id*.  "For example, if the auxiliary data is provided in a plurality of packets, channel data (or data that could be used to determine channel data) (e.g., via a look-up table) could be include[d] in at least one packet (e.g., in a packet's header, payload, etc.)."  *Id*. at col. 8, ll. 48-59.

30.     Parsing a program into segments and providing information on individual segments (e.g., when each segment begins and ends), including how this information is received, linked to the program and/or segment, used (e.g., by the processor), etc. are non-conventional improvements to traditional, conventional DVR technology.

31.     In certain embodiments, a single tuner may be used to acquire more than just a single program, or data on a single program.  To this end, the Asserted Patents provide that a single channel (e.g., channel 247) can be "used to not only broadcast program data (e.g., sitcoms, sports movies, etc.), but also to broadcast auxiliary data."  *Id*. at col. 8, ll. 30-47.  "For example, channel 1247 could carry auxiliary data for channel 247 and channel 248, auxiliary data for first program data and for second program data, auxiliary data for a first segment and for a second segment, etc., wherein each type of auxiliary data includes data that identifies the channel, program or segment for which it pertains."  *Id*. at col. 8, ll. 48-59.

32.     This is accomplished by setting a tuner to a particular channel, where the channel is identified by either the controller or the processor.  *See*, *e.g.*, *id*. at col. 3, ll. 4-14 ("wherein the tuner is configured to receive data on at least one channel from an antenna, and to access data on a particular channel, as selected by either the controller or the processor").  In other words, "the processor 740 may select a particular channel if it needs to acquire auxiliary data or program data that needs to be recorded."  *Id*. at col. 7, ll. 40-45.  "The processor 740 could then set the tuner 722 to this channel (e.g., 247) to receive the auxiliary data."  *Id*. at col. 8, ll. 30-47.  Thus, it is the processor (or controller) that must identify the channel that includes information on a plurality of programs and tune the DVR accordingly.

33.     By using a single channel to acquire data on a plurality of programs, other tuners can be freed up for receiving and/or recording other programs, as there are a limited number of tuners available on a DVR.  To this end, the Asserted Patents provide that "[i]t should be appreciated that the processor 740 may be configured to set the secondary tuner 724 to the channel that includes the auxiliary data.  This is done so that the primary tuner 722, which may be in use by the user (e.g., to buffer live television, to record another program, etc.), is left unchanged."  *Id*.

at col. 8, ll. 48-59.  Using a single tuner to acquire data on a plurality of programs is yet another example of non-conventional improvements to an otherwise traditional, conventional DVR.

34.     Other examples of non-conventional improvements include a DVR with different operating states, where the states are both time-based and user selected.  For example, during a first period of time, the user is not allowed to place the DVR in a second playback state (e.g., a commercial skipping state).  This is a benefit to the advertiser, ensuring playback of a commercial during the advertiser's contracted period of time and when the commercial is most relevant.  Allowing the user to skip commercials during this period of time "can decrease the value of the program to the content owner, the content provider and advertiser."  *Id*. at col. 1, ll. 42-49.

35.     However, after the first period of time, skipping commercials is less concerning to the advertiser, and more advantageous to the user.  "For example, a program may include an advertisement for a movie that is currently being shown at a local theater.  If, however, the user does not watch the program for several weeks, the movie may no longer be playing at the local theater."  '710 Patent, col. 1, ll. 50-61.  In this example, the advertisement for the movie "is removed only after its value has diminished."  *Id*. at Abstract.

36.     "By way of another example, the program may include information at the bottom of the screen (e.g., news ticker or 'crawler'), identifying upcoming programs, late-breaking news, scores of daily sporting events, etc.  Obviously, if the user does not watch the program for several weeks, this information is outdated, and of little value."  *Id*. at col. 1, ll. 50-61.

37.     Thus, the user can only place the claimed DVR into the second playback state (e.g., the commercial skipping state) after the first period of time has lapsed (e.g., after the commercial is outdated or of less value), or during a second period of time.

38.      By not allowing a user to skip commercials (or the like) during the first period of time and allowing the user to either watch or not watch commercials (or the like) during the second period of time, the claimed DVR strikes a balance between the interests of the advertiser and the user.   It also solves a decade-old problem inherent with broadcast television.   "The problem originates from the fact that this type of information (e.g., advertisements, news tickers, 'crawlers,' etc.) is selected based on when the program is being viewed.   For example, if a program is being broadcasted on a Monday afternoon, then it may include commercials directed toward mothers, or individuals who are home on Monday afternoon.   Similarly, if a program is being broadcasted on a sports channel on Sunday night, then it may include a news ticker on scores for sporting events that took place earlier that day."   *Id*. at col. 1, l. 52 – col. 2, l. 4.

39.      The Asserted Patents solve this problem by implementing a state-machine that prevents skipping during a first period of time, and allows skipping (or not, depending on the user's desire) during a second period of time.

40.      For example, Claim 1 of the '710 patent provides for a DVR that is configured to (1) receive a video program that includes first, second, and third portions, where the second portion (e.g., a commercial) follows the first portion, and the third portion follows the second portion, (2) play the video program in its entirety if a second command (e.g., a play command) is received during a first period of time, (3) play the video program in its entire if the second command (e.g., the play command) is received during a second period of time and the DVR is in a first playback state (e.g., a non-commercial-skipping state), and (4) play only a portion of the video program if the second command (e.g., the play command) is received during the second period of time and the DVR is in a second playback state (e.g., a commercial-skipping state), wherein (a) the "portion"

includes the first and third portions of the video program and (b) the third portion is played immediately following the first portion of the video program.

41.      To this end, "the auxiliary data [e.g., a commercial] is removed only after its value has diminished." *Id*. at Abstract.  "[A] user may be able to program the receiver/DVR (e.g., during set-up) to enable/disable the receiving and/or displaying of auxiliary data (or a portion thereof)." *Id*. at col. 9, l. 44 – col. 10, l. 3.  "For example, a user who is recording a first sporting event and watching a second sporting event, either in real-time or time-shifted, may not want to receive updates (e.g., in the form of a news ticker) on the first sporting event.  Thus, a user may be able to program the processor 740 to display only program data, and not auxiliary data [e.g., commercials, news tickers, etc.], or filter the auxiliary data so that certain information is displayed, or certain information is not displayed." *Id*.

42.      A programmable DVR that functions as a state-machine, or plays commercials during a first period of time, plays commercials during a second period of time if the DVR is in a first playback state (e.g., a non-commercial skipping state), and skips commercials during a second period of time if the DVR is in a second playback state (e.g., a commercial skipping state), is a non-conventional improvement over traditional, conventional DVR technology.

43.      At the time of the invention, there was a need to balance customers' desire to easily skip commercials with advertisers' desire to have commercials played for at least a contracted period of time.  It was also critical that the media content remain unaltered to avoid copyright concerns.  The Asserted Patents strike a delicate balance among these three competing interests.

## THE ACCUSED PRODUCTS

44.      DBS repeats and re-alleges the allegations in Paragraphs 1-43 as though fully set forth in their entirety.

13

45.      DISH infringed the Asserted Patents by making, using, selling, offering to sell, and/or importing its DVRs that utilize technology to skip downloaded programming, including commercials.  Exemplary accused infringing DVR devices include, but are not limited to, the DISH Hopper, DISH Hopper 2, DISH Hopper 3, Hopper with Sling, and Hopper Duo (collectively, the "Accused Products").

## EXAMPLES OF DISH'S MARKETING OF THE ACCUSED PRODUCTS

46.      The Accused Products have features including, but not limited to, at least the following:  Primetime Anytime (using a single tuner to download all network primetime shows, which frees up other tuners for regular viewing and/or recording) and Auto Hop (which allows a user to skip commercials) (collectively, the "Features").

47.      The Features drive the popularity and sales of the Accused Products.

48.      For example, DISH has marketed the Accused Products using the Primetime Anytime feature as a convenience tool that provides the customer a better experience by saving the customer time and energy, as described in the following screenshot from DISH's website:[1]

---

[1]      DISH      Network      L.L.C.,      *Primetime      Anytime*,      available      at https://www.dish.com/features/primetime-anytime/ (last accessed Aug. 16, 2022).







49.     DISH has also marketed its Accused Products using the AutoHop feature as a convenience tool that allows a user to skip commercials, as described in the following screenshot from DISH's website:[2]

---

[2] DISH Network L.L.C., *AutoHop*, available at https://www.dish.com/features/autohop/ (last accessed Aug. 16, 2022).



50.     After a program airs, AutoHop establishes time-stamps for when commercial breaks start and stop and sends those stamps to the user's DVR.  The DVR can then use these stamps to skip commercials when the user places the DVR in commercial-skip (AutoHop) mode. However, AutoHop can only be used during a period of time after the program airs (which period of time may vary by network).  This guarantees that commercials will be viewed with the program for a set period of time.  The period of time is based on contracts that the networks have with their advertisers, ensuring commercial placement for the period of time.  After that period has passed, the DVR allows users to skip the commercials.

51.     The importance of time-skipping technology for a DVR system is well-documented:[3]

## Dish Network adds 'Auto Hop' commercial skipping feature to its Hopper DVRs



R. Lawler
@Rjcc
May 10th, 2012

In this article: auto hop, AutoHop, commercial skip, commercial skipping, commercials, CommercialSkip, CommercialSkipping, dish,



May 10, 2012) - DISH (NASDAQ: DISH) satellite subscribers will now get the feature viewers have been waiting for since the beginning of television -- the choice to automatically skip over commercials. The new "Auto Hop" capability for the Hopper whole-home HD DVR system is being activated today, and it allows customers to skip all commercials

52.     The Consumer Electronics Association has named DISH's AutoHop™ commercial-skipping feature as an International Consumer Electronics Show (CES) Innovations

---

[3]     *See, e.g.,* https://www.engadget.com/2012-05-10-dish-network-adds-auto-hop-commercial-skipping-feature-to-its.html (last accessed Aug. 16, 2022).

2013 Design and Engineering Award Honoree, awarded for outstanding design and engineering in consumer electronics products. The awardees were judged on numerous criteria, including "[e]ngineering qualities, based on technical specs and materials used"; "[a]esthetic and design qualities, using photos provided"; "[t]he product's intended use/function and user value"; "[u]nique/novel features that consumers would find attractive"; and "[h]ow the design and innovation of the product compares to other products in the marketplace."[4]

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 8,929,710

53.     DBS repeats and re-alleges the allegations in Paragraphs 1-52 as though fully set forth in their entirety.

54.     DBS owns all substantial rights, interest, and title in and to the '710 patent, including the sole and exclusive right to prosecute this action and enforce the '710 patent against infringers, and to collect damages for all relevant times.  The United States Patent and Trademark Office duly issued the '710 patent on January 6, 2015.  The '710 patent has a priority date of November 1, 2010.  A copy of the '710 patent is attached as Exhibit 1.

55.     The '710 patent is titled "System and Method for Time Shifting at least a Portion of a Video Program."  The '710 patent describes a DVR that can time shift at least a portion of a transmitted video program.

56.      The '710 patent includes claims that cover a DVR that is configured to play a stored video program in its entirety during a first period of time regardless of the playback state (or the user's desire to skip commercials), play a stored video program in its entirety during a second period of time when the DVR is in a first playback state (e.g., a non-commercial skipping state),

---

[4] https://about.dish.com/news-releases?item=122729 (last accessed Aug. 22, 2022).

and to play only a portion of the stored video program during the second period of time when the DVR is in a second playback state (e.g., a commercial skipping state).

57.     The claims of the '710 patent are not directed to an abstract idea. Specifically, the claims of the '710 patent include additional elements that integrate the claims into practical applications and include inventive concepts sufficient to transform the nature of the claims into patent-eligible applications.

58.     DISH has directly infringed (literally or under the doctrine of equivalents) at least Claim 1 of the '710 patent.

59.     DISH has infringed the '710 patent by making, using, selling, offering for sale, and importing the Accused Products.

60.     The Accused Products are DVRs that include AutoHop for time shifting at least a portion of a transmitted video program.  The Accused Products include a tuner for receiving the video program as transmitted, the video program including at least first, second, and third portions, wherein the second portion as transmitted is configured to follow the first portion, and the third portion as transmitted is configured to follow the second portion.

61.     For example, as shown below, the user can select "DVR" on their remote control and then "PrimeTime Anytime," which results in the DISH DVR receiving a plurality of video programs, where each one includes the foregoing first, second, and third portions.



62.     The Accused Products include a memory device for storing the video program, allowing at least a portion of the video program to be played back at a later time.  This can be seen below, where a plurality of PrimeTime video programs are stored in memory and can be played back at a later time.



63.     The Accused Products also include a controller configured to receive commands from a user, wherein a first command changes the DVR from a first playback state to a second playback state, and a second command initiates playback of the video program from the memory device.  By way of example, the DISH DVR will play back a particular video program if the user selects a particular program (see above) and chooses to "Watch" that program (e.g., receiving the second command) (see below).



64.     As shown below, the DISH DVR is also configured to operate in either a first playback state (e.g., a non-commercial skipping state) or a second playback state (e.g., a commercial skipping state) by selecting "Yes" or "No Thanks" to the question "Would you like to enable AutoHop™ for this event?".



65.     The Accused Products include at least one processor that is configured to provide the video program in its entirety to a display device in response to receiving the second command (e.g., "Watch") regardless of a playback state of the DVR if the second command is received during a first period of time.  This can be seen above, where video programs received during the first period of time (i.e., recently stored video programs) do not include a red kangaroo.  According to DISH, "[t]o skip commercials, there needs to be a red kangaroo on the upper-left corner of the program title."  In other words, a recently recorded video program (i.e., one received during the first period of time) can only be provided in its entirety.

66.     The processor is also configured to provide the video program in its entirety to the display device in response to receiving the second command if the second command is received during a second period of time and the DVR is in the first playback state.  This can be seen above,

where video programs received during the second period of time are identified with a red kangaroo, indicating that commercials can be skipped.  However, if the user selects "No Thanks" to the question "Would you like to enable AutoHop™ for this event?", then the video program is provided in its entirety.

67.     The processor is further configured to provide only a portion of the video program to the display device in response to receiving the second command if the second command is received during the second period of time and the DVR is in the second playback state, the portion of the video program including at least the first and third portions of the video program, where the third portion is provided to the display device immediately following the first portion.  This can be seen above, where video programs received during the second period of time are identified with a red kangaroo, indicating that commercials can be skipped.  If the user selects "Yes" to the question "Would you like to enable AutoHop™ for this event?", then the video program is provided without commercials (i.e., skipping the second portion, or only providing the first and third portions, where the third portion immediately follows the first portion).

68.     DBS has been damaged as a result of the infringing conduct by DISH alleged above. Thus, DISH is liable to DBS in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

69.     DBS has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '710 patent.

70.     DBS has not offered for sale nor sold any product implicated by 35 U.S.C. § 287 with respect to the '710 patent.

71.     DISH had knowledge of the '710 patent at least as of the filing of this Complaint.

72.     Furthermore, DISH obtained knowledge of the '710 patent—if DISH did not already possess such knowledge—at least no later than November 9, 2018, when the '710 patent was cited in an Information Disclosure Statement during the prosecution of U.S. Patent Application No. 16/109,759, which later issued as U.S. Patent No. 10,856,038 ("the '038 patent"). The '038 patent was initially assigned to Sling Media Pvt. Ltd., which upon information and belief was a subsidiary of DISH.

73.     DISH has also indirectly infringed one or more claims of the '710 patent by inducing others to directly infringe the '710 patent.  DISH has induced end-users and other third-parties to directly infringe (literally or under the doctrine of equivalents) the '710 patent by using the Accused Products.  DISH took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '710 patent, including, for example, Claim 1 of the '710 patent.  Such steps by DISH included, among other things, advising or directing end-users and other third-parties to use the Accused Features in the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide end-users and other third-parties to use the Accused Products in an infringing manner. DISH performed these steps, which constitute induced infringement, with the knowledge of the '710 patent and with the knowledge that the induced acts constitute infringement.  DISH was aware that the normal and customary use of the Accused Products by others would infringe the '710 patent.  DISH's direct and indirect infringement of the '710 patent was willful, intentional, deliberate, or in conscious disregard of DBS's rights under the patent.

## COUNT II

## INFRINGEMENT OF U.S. PATENT NO. 9,538,122

74.    DBS repeats and re-alleges the allegations in Paragraphs 1-73 as though fully set forth in their entirety.

75.    DBS owns all substantial rights, interest, and title in and to the '122 patent, including the sole and exclusive right to prosecute this action and enforce the '122 patent against infringers, and to collect damages for all relevant times.  The United States Patent and Trademark Office duly issued the '122 patent on January 3, 2017.  The '122 patent has a priority date of November 1, 2010.  A copy of the '122 patent is attached as Exhibit 2.

76.    The '122 patent is titled "System and Method for Time Shifting at least a Portion of a Video Program."  The '122 patent describes a DVR that can time shift at least a portion of a transmitted video program and download video programs using a single tuner.

77.    The '122 patent includes claims that cover a DVR that is configured to play a stored video program in its entirety during a first period of time regardless of the playback state (or the user's desire to skip commercials), play a stored video program in its entirety during a second period of time when the DVR is in a first playback state (e.g., a non-commercial skipping state), and to play only a portion of the stored video program during the second period of time when the DVR is in a second playback state (e.g., a commercial skipping state).

78.    The '122 patent also includes claims where a plurality of programs are received using a single tuner.

79.    DISH has directly infringed (literally or under the doctrine of equivalents) at least Claim 1 of the '122 patent.  DISH has infringed the '122 patent by making, using, selling, offering to sell, and importing the Accused Products.

80.     The claims of the '122 patent are not directed to an abstract idea. Specifically, the claims of the '122 patent include additional elements that integrate the claims into practical applications and include inventive concepts sufficient to transform the nature of the claims into patent-eligible applications.

81.     The Accused Products are DVRs that include AutoHop for time shifting at least a portion of a transmitted video program.  The Accused Products include a tuner for receiving a plurality of video programs, wherein the plurality of video programs are transmitted at the same time on a single channel, the tuner can be tuned to the single channel to receive the plurality of video programs, and at least one of the video programs includes at least first, second, and third portions, wherein the second portion as transmitted is configured to follow the first portion, and the third portion as transmitted is configured to follow the second portion.

82.     For example, as shown below, the user can select "DVR" on their remote control and then "PrimeTime Anytime," which results in the DISH DVR receiving a plurality of video programs on a single channel at the same time, wherein each one includes the foregoing first, second, and third portions.





83.     The Accused Products include a memory device for storing the plurality of video programs, allowing at least one of the video programs to be played back at a later time.  This can be seen below, where a plurality of PrimeTime video programs are stored in memory and can be played back at a later time.



84.     The Accused Products also include a controller configured to receive commands from a user, wherein a first command changes the DVR from a first playback state to a second

playback state, a second command initiates playback of the video program from the memory device, and a third command instructs the DVR to receive and store the plurality of video programs.  By way of example, the DISH DVR will receive and store the plurality of video programs if the user selects "PrimeTime Anytime" (e.g., receiving the third command) (see above). The DISH DVR will then playback a particular video program if the user selects a particular program (see above) and chooses to "Watch" that program (e.g., receiving the second command) (see below).



85.     As shown below, the DISH DVR is also configured to operate in either a first playback state (e.g., a non-commercial skipping state) or a second playback state (e.g., a commercial skipping state) by selecting "Yes" or "No Thanks" to the question "Would you like to enable AutoHop™ for this event?"



86.      The Accused Products include at least one processor that is configured to provide the video program in its entirety to a display device in response to receiving the second command (e.g., "Watch") regardless of a playback state of the DVR if the second command is received during a first period of time.  This can be seen above, where video programs received during the first period of time (i.e., recently stored video programs) do not include a red kangaroo.  According to DISH, "[t]o skip commercials, there needs to be a red kangaroo on the upper-left corner of the program title."  In other words, a recently recorded video program (i.e., one received during the first period of time) can only be provided in its entirety.

87.      The processor is also configured to provide the video program in its entirety to the display device in response to receiving the second command if the second command is received during a second period of time and the DVR is in the first playback state.  This can be seen above, where video programs received during the second period of time are identified with a red kangaroo, indicating that commercials can be skipped.  However, if the user selects "No Thanks" to the question "Would you like to enable AutoHop™ for this event?", then the video program is provided in its entirety.

88.     The processor is further configured to provide only a portion of the video program to the display device in response to receiving the second command if the second command is received during the second period of time and the DVR is in the second playback state, the portion of the video program including at least the first and third portions of the video program, where the third portion is provided to the display device immediately following the first portion.  This can be seen above, where video programs received during the second period of time are identified with a red kangaroo, indicating that commercials can be skipped.  If the user selects "Yes" to the question "Would you like to enable AutoHop™ for this event?", then the video program is provided without commercials (i.e., skipping the second portion, or only providing the first and third portions, where the third portion immediately follows the first portion).

89.     DBS has been damaged as a result of the infringing conduct by DISH alleged above. Thus, DISH is liable to DBS in an amount that adequately compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

90.     DBS has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '122 patent.

91.     DBS has not offered for sale nor sold any product implicated by 35 U.S.C. § 287 with respect to the '122 patent.

92.     DISH had knowledge of the '122 patent at least as of the filing of this Complaint.

93.     DISH has also indirectly infringed one or more claims of the '122 patent by inducing others to directly infringe the '122 patent.  DISH has induced end-users and other third-parties to directly infringe (literally or under the doctrine of equivalents) the '122 patent by using the Accused Products.  DISH took active steps, directly or through contractual relationships with

30

others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '122 patent, including, for example, Claim 1 of the '122 patent.  Such steps by DISH included, among other things, advising or directing end-users and other third-parties to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide end-users and other third-parties to use the Accused Products in an infringing manner.  DISH performed these steps, which constitute induced infringement, with the knowledge of the '122 patent and with the knowledge that the induced acts constitute infringement.  DISH was aware that the normal and customary use of the Accused Products by others would infringe the '122 patent.  DISH's direct and indirect infringement of the '122 patent was willful, intentional, deliberate, or in conscious disregard of DBS's rights under the patent.

## JURY DEMAND

DBS hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

DBS requests that the Court find in its favor and against DISH, and that the Court grant it the following relief:

a.      Judgment that one or more claims of the Asserted Patents have been infringed, either literally or under the doctrine of equivalents, by DISH or all others acting in concert therewith;

b.      Judgment that DISH accounts for and pays to DBS all damages to and costs incurred by DBS because of DISH's infringing activities and other conduct complained of herein;

c.      Judgment that DISH's infringements be found willful, and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

     d.     Pre-judgment and post-judgment interest on the damages caused by DISH's infringing activities and other conduct complained of herein;

     e.     That the Court declare this an exceptional case and award DBS its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

     f.     All other and further relief as the Court may deem just and proper under the circumstances.

Dated: August 29, 2022              Respectfully submitted,

By: */s/ Todd E. Landis*
Todd E. Landis
State Bar No. 24030226
WILLIAMS SIMONS & LANDIS PLLC
2633 McKinney Ave., Suite 130 #366
Dallas, TX 75204
Tel: 512-543-1357
tlandis@wsltrial.com

Fred I. Williams
Texas State Bar No. 00794855
Michael Simons
Texas State Bar No. 24008042
WILLIAMS SIMONS & LANDIS PLLC
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701
Tel: 512-543-1354
fwilliams@wsltrial.com
msimons@wsltrial.com

John Wittenzellner
Pennsylvania State Bar No. 308996
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A #453
Philadelphia, PA 19103
Tel: 512-543-1373
johnw@wsltrial.com

*Attorneys for Plaintiff Digital Broadcasting Solutions, LLC*